O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHERISE TOUHEY, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA and ERIC H. HOLDER, JR., in his official capacity as United States Attorney General, <br><br> Defendants. | Case No. EDCV 08-01418-VAP (RCx) <br><br> **ORDER GRANTING JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** <br><br> **[Motion filed on June 13, 2011]** |

Before the Court is the Joint Motion for Final Approval of Class Action Settlement ("Joint Motion") filed by Plaintiff Cherise Touhey ("Plaintiff" or "Touhey"), on behalf of herself and all others similarly situated ("Plaintiffs"), and Defendants United States of America and Eric H. Holder, Jr., in his official capacity as United States Attorney General (collectively, "Defendants" or "the government"). The parties came

before the Court for the final fairness hearing on July 19, 2011. After considering all papers filed in support of the Joint Motion and the arguments put forth at the hearing, the Court GRANTS the Motion.

## I. BACKGROUND

### A. Factual Background

On June 21, 2007, agents from the Pomona Police Department and the Drug Enforcement Administration ("DEA") seized, among other items, $26,943.83 from a bank account in Touhey's name. (Compl. ¶ 27; Doc. No. 39 (Jan. 14, 2010, Minute Order) at 2-3.) The DEA then initiated administrative forfeiture proceedings, which Touhey contested. (Compl. ¶¶ 28-29.) On October 13, 2007, the government filed a judicial complaint against other seized property, but not against the seized $26,943.83. (Id. ¶ 30.) On January 9, 2008, the U.S. Marshals Service returned the seized funds to Touhey through her attorney by check. (Id. ¶ 31.) The check did not include any interest accrued on the funds for the seven months it was held by the government, and Touhey has not received any additional payments since that time. (Id.)

### B. Procedural History

On October 14, 2008, Touhey, on behalf of herself and all others similarly situated, filed a putative class

action complaint against Defendants seeking: (1) "an injunction and/or declaratory relief ordering payment or disgorgement of interest accrued on all seized funds later returned" pursuant to 5 U.S.C. § 701, _et seq._; and (2) "an injunction and/or declaratory relief ordering defendants to pay interest on all returned funds as to all pending and future seizures" pursuant to 5 U.S.C. § 701, _et seq._ (Doc. No. 1.)

On August 20, 2009, the Court denied Defendants' motion to dismiss the action. (Doc. No. 21.) On January 14, 2010, the Court denied Defendants' motion for summary judgment. (Doc. No. 39.) On September 21 and October 28, 2010, the parties engaged in a settlement conference with Magistrate Judge Rosalyn M. Chapman. (Doc. Nos. 50, 52.)

On December 20, 2010, the parties filed a Joint Motion for Preliminary Approval of Class Action Settlement ("Preliminary Joint Motion"), requesting the Court: (1) preliminarily approve the class action settlement; (2) conditionally certify a class pursuant to Federal Rules of Civil Procedure 23(b)(1)(A) and 23(b)(2) for purposes of settlement; (3) appoint the Law Office of Eric Honig as class counsel; (4) schedule a final fairness hearing to consider final approval of the settlement; and (5) require the parties to complete their

responsibilities as set forth in the settlement agreement
prior to the final fairness hearing.  (Doc. No. 53.)

On January 25, 2011, the Court:  (1) denied the
Preliminary Joint Motion on the grounds that Defendants
had failed to meet their obligations under the Class
Action Fairness Act of 2005 ("CAFA"); (2) certified the
proposed class defined as "All claimants or other persons
with concluded CAFRA non-judicial forfeiture cases, where
no judicial complaint was filed and all of the seized
currency was returned, but without interest, within the
jurisdiction of the Ninth and Sixth Circuit Courts of
Appeal"; and (3) appointed the Law Office of Eric Honig
as class counsel ("Class Counsel").  (Doc. No. 56
(January 2011 Preliminary Approval Order).)

On January 28, 2011, the parties filed an Amended
Joint Motion for Preliminary Approval of Class Action
Settlement ("Amended Preliminary Joint Motion") stating
the parties had since complied with the CAFA
requirements.  (Doc. No. 58.)  On February 3, 2011, the
Court:  (1) granted the Amended Preliminary Joint Motion;
(2) preliminarily approved the proposed settlement
agreement, except for paragraphs 48 regarding the
incentive payment to Touhey and paragraphs 75 through 78
regarding attorneys' fees; and (3) set a scheduling order
and dates for a final fairness hearing and related

deadlines.  (Doc. No. 61 (February 2011 Preliminary
Approval Order).)

The Court established June 13, 2011, as the deadline
for class members to opt out of the settlement, and
ordered the parties to file a motion for final approval
of the settlement no later than June 13, 2011.  (February
2011 Preliminary Approval Order at 3-4.)

The parties filed the Joint Motion on June 13, 2011.
(Doc. No. 65.)  In support of the Joint Motion, the
parties submitted:  (1) a declaration from Defendants'
counsel Victor A. Rodgers ("Rodgers Decl."), including
his declaration from the Sueoka Action[1] in support of
final approval of that settlement (Rodgers Decl., Ex. A),
and evidence of the government's compliance with the
requirements of CAFA (id., Exs. B-D) (Doc Nos. 65-1-65-
5); (2) a declaration from settlement implementor
Jennifer Bukvics ("Bukvics Decl."), including copies of
the proposed settlement notice and claim form that were
sent out, published in USA Today, and posted on the
website regarding the settlement (Bukvics Decl., Exs. A-
E) (Doc. Nos. 65-6-65-11); (3) a declaration from Class

_____

[1] As will be explained in Section I.C.1, infra, the
Sueoka Action was another class action in this district
that dealt with almost identical issues and involved many
of the same attorneys as the present action.  See Julie
Sueoka, et al. v. United States of America, et al., No.
CV-98-6313-MMM (RCx) (C.D. Cal. Feb. 14, 2008).

5

Counsel Eric Honig ("Honig Decl."), including his declaration from the Sueoka Action in support of final approval of that settlement (Honig Decl., Ex. A) (Doc. Nos. 65-12-65-13); (4) a declaration from Touhey's counsel Paul Gabbert ("Gabbert Decl.") (Doc. No. 65-14); and (5) a declaration from Touhey ("Touhey Decl.") (Doc. No. 65-15).

The parties also resubmitted a number of documents from the Preliminary Joint Motion, including: (6) a second declaration from Victor A. Rodgers ("Second Rodgers Decl."), attaching a copy of the settlement agreement in this action ("Settlement Agreement") (Second Rodgers Decl., Ex. A), and a copy of the settlement agreement in the Sueoka Action ("Sueoka Settlement Agreement") (Doc. Nos. 65-16-65-18); (7) an appendix in support of the Joint Motion ("Joint Mot. App.") with a redlined comparison of the differences between the current Settlement Agreement and the Sueoka Settlement Agreement (Doc. Nos. 65-19-65-20); (8) a Request for Judicial Notice ("RJN") of three attached exhibits, all of which are orders from the Sueoka Action[2] (RJN, Exs. A,

---

[2] Courts may take judicial notice of "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." Bias v. Moynihan, 508 F.3d 1212, 1225 (9th Cir. 2007) (citing Bennett v. Medtronic, Inc., 285 F.3d 801, 803 n.2 (9th Cir. 2002)). Given the importance of the Sueoka Action to the present action, the Court takes judicial notice of the submitted

(continued...)

B, & C) (Doc. Nos. 65-21-65-24); and (9) a proposed final judgment (Doc. No. 65-25).

## C.   Legal Background

The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") sets forth the procedural requirements for a federal government agency when it seizes property from a person.  (See 18 U.S.C. § 981; see also Joint Mot. at 2-3.)  Under CAFRA, the agency must initiate administrative forfeiture proceedings within 60 days (or, in some circumstances, 90 days) of the seizure by sending written notice to any interested parties advising them of their right to contest the forfeiture.  (See 18 U.S.C. § 983(a).)  If the party chooses to contest the forfeiture, the matter is referred to the United States Attorney's Office ("USAO") for the USAO to decide whether to file a judicial forfeiture action against the seized property. (Joint Mot. at 3.)  If the USAO fails to file a judicial forfeiture action within 90 days of the seizing agency receiving the party's claim, the government must release the property.  (See 18 U.S.C. § 983(a)(3)(A) & (B); see also Joint Mot. at 3.)

_____

[2](...continued)
orders from the Sueoka Action.  Fed. R. Evid. 201(b).

7

Touhey bases this action on the Ninth Circuit's decision in <u>United States v. $277,000.00 in U.S. Currency</u>, 69 F.3d 1491 (9th Cir. 1995), which held that the principle of sovereign immunity does not bar suits against the government in cases seeking to disgorge interest earned by the government on currency seized for asset forfeiture purposes. <u>Id.</u> at 1498. Thirteen years later, in <u>Carvajal v. United States</u>, 521 F.3d 1242 (9th Cir. 2008), the Ninth Circuit upheld <u>$277,000.00</u> and found that it survived the passage of CAFRA, allowing a plaintiff to sue the government for interest on money seized but never subject to a civil forfeiture proceeding. <u>Id.</u> at 1248-49. To date, the Sixth Circuit is the only other Circuit to adopt the holding of <u>$277,000.00</u>. <u>Id.</u> at 1249.

### 1. The <u>Sueoka</u> Litigation

On August 4, 1998, Julie Sueoka ("Sueoka") and two other class representatives initiated a putative class action against the government and a number of its officers in their official capacity challenging the same practices challenged here (the "<u>Sueoka</u> Action"). <u>See Julie Sueoka, et al. v. United States of America, et al.</u>, No. CV-98-6313-MMM (RCx) (C.D. Cal. Feb. 14, 2008). In the <u>Sueoka</u> Action, the plaintiffs sought disgorgement of the interest earned by the government on money seized in asset forfeiture cases, as well as interest earned and

allegedly improper deductions taken from cost bonds
posted by plaintiffs.  (See RJN, Ex. B. at 2.)

After extensive litigation in the Sueoka Action,
including an appeal to the Ninth Circuit,[3] the parties
participated in a series of settlement conferences in
2005 and 2006.  (RJN, Ex. B at 5.)  Following the
completion of thirteen settlement conferences, the
parties jointly sought to certify five subclasses of
plaintiffs, which the Court, the Honorable Margaret M.
Morrow presiding, certified on February 2, 2007.  (RJN,
Ex. A.)  The Court also gave preliminary approval to the
settlement agreement in May 2007, and, following
notification of the class and a final fairness hearing,
gave final approval to the class action settlement in
October 2007.  (RJN, Exs. B, C.)

The Sueoka Action is particularly relevant here
because subclass A-2 in that action was almost identical
to the proposed class in this case, the only difference
being that the current class had their monetary assets
seized after the passage of CAFRA in 2000, while Sueoka's
subclass A-2 covered claimants with concluded pre-CAFRA
cases.  (Joint Mot. at 5, 9-10.)  Additionally, the terms
of the proposed settlement agreement here and the

---

[3] Sueoka v. United States, 101 F. App'x 649 (9th Cir.
2004).

9

approved settlement agreement in the _Sueoka_ Action are almost identical. (_Id._ at 5; _see also_ Second Rodgers Decl. ¶¶ 3-5; Joint Mot. App., Ex. A.) The parties argue that, because the _Sueoka_ Action was vigorously litigated over the course of nine years by the same counsel presently representing the respective sides, the parties "have had ample time to evaluate the relative strengths and weaknesses of their positions in this case." (Joint Mot. at 4.) As in the Preliminary Joint Motion, many of the documents submitted in support of the Joint Motion are nearly identical to documents used in the _Sueoka_ Action, and the parties assert that they have drawn on their experiences in the _Sueoka_ Action in litigating this action.

**D.   Settlement Terms**

The Settlement Agreement defines the class as follows: "All claimants or other persons with concluded CAFRA non-judicial forfeiture cases, where no judicial complaint was filed and all of the seized currency was returned, but without interest, within the jurisdiction of the Ninth and Sixth Circuit Courts of Appeal." (Settlement Agreement ¶ 3.)

Under the Settlement Agreement, the government agrees to pay to all class members an award consisting of: (1) a base award, composed of the interest earned on the seized

currency while it was held by the government, and (2) interest on the base award which would have accrued since the initial return date, calculated using compound interest rather than simple interest. (Joint Mot. at 14-16; Settlement Agreement Monetary Damage Methodology ("MDM") at 7-8.) The interest rate for the base award is determined by the actual interest earned on the currency if it was deposited in an interest-bearing government account. (MDM at 8-9.) The interest rate for the interest on the base award is either the applicable average annual United States 30-day Treasury bill rate or the actual monthly United States 30-day Treasury bill rate, at the Defendants' discretion. (Id.)

### 1. Settlement Procedure

The parties retained the firm Lockheed Martin to implement the Settlement Agreement and contact the potential class members.[4] (Bukvics Decl. ¶¶ 1, 5.) By April 4, 2011, Lockheed Martin mailed 1,875 notice packages via first class mail to the potential class members whose mailing addresses were known to the

---

[4] Under the Settlement Agreement, the parties proposed to notify potential class members in the following manners: (1) by mail, using the addresses found in a search of Defendants' computer records and physical files; (2) by publication of a notice in the newspaper USA Today; (3) by posting a notice on a publicly accessible internet website; and (4) by maintaining a toll-free telephone number with recorded information regarding the proposed settlement. (Settlement Agreement ¶¶ 9-14.)

government.  (Id. ¶ 6.)  The notice packages included a mail notice explaining the proposed class settlement, including the contact information for Class Counsel, the background of the lawsuit, a summary of the settlement and claim procedures, and a claim form.  (Id., Exs. A, B.)  The notice packages also included information about opting out of the class and attending the settlement fairness hearing before the Court.[5]  The notices advised the class members of the September 9, 2011, deadline for submitting a claim form.  (Id., Ex. A at 6.)

On April 4, 2011, Lockheed Martin established an internet website at the domain name www.Notice-of-ClassAction-Settlement.com providing information about the proposed settlement and copies of the website notice and claim forms.[6]  (Bukvics Decl. ¶ 9.)  In addition, since March 25, 2011, Lockheed Martin has established and

---

[5] The final settlement fairness hearing was initially scheduled to take place on Monday, July 11, 2011, at 2:00 p.m., but was continued to Tuesday, July 19, 2011, at 2:00 p.m.  (Doc. No. 69.)  The government updated its notices to reflect the new time, and also ensured someone from its office was present at the courthouse on the afternoon of July 11 to inform any objectors who might appear wishing to be heard.  (See Doc. No. 70 (Not. re: Non-Appearance); id., Rodgers Decl.)  No one appeared for the hearing between the hours of 1:45 p.m. and 2:30 p.m. (Not. re: Non-Appearance, Ann Eberhardy Decl., ¶ 2.)

[6] The Court last viewed the website on Friday, July 15, 2011, at 11:00 a.m., and found the website to contain all the relevant information regarding the class action settlement, and to have active links to the relevant documents, including the Settlement Agreement, the notice of the class action, and a claim form.

maintained a toll-free telephone number with a recorded message providing information about the settlement, and directing callers to go to the website or to contact Class Counsel for more information. (<u>Id.</u>, ¶ 8.)

Finally, on March 31, 2011, Lockheed Martin ran the settlement publication notice in <u>USA Today</u>. (Bukvics Decl. ¶ 7; <u>id.</u>, Ex. E.) The parties have thus complied with the terms of the Settlement Agreement regarding providing notice to potential class members.

### 2. Responses of Class Members

As of June 7, 2011, Lockheed Martin had received 38 claims and no opt-outs of the settlement. (Bukvics Decl. ¶¶ 11, 12.) The postmark deadline for receiving claim forms is September 9, 2011. (<u>Id.</u> ¶ 12.)

### 3. Claims Procedure

Class members had until June 13, 2011, to opt out of the settlement, and have until September 9, 2011, to file a claim form. (Bukvics Decl. ¶¶ 9, 11; <u>id.</u>, Ex. A at 6.) If the government determines a claimant qualifies as a class member, it will determine the award they are due based upon the formula in the MDM. (<u>Id.</u> ¶ 24.) Class members who are dissatisfied with their calculated award have the right to appeal the ruling to a neutral third party claims administrator. (<u>Id.</u> ¶¶ 32-40.) The parties

do not propose any amendments to the Settlement Agreement based upon the responses of the class members.

## II. LEGAL STANDARD

Before approving a class action settlement, the court must determine whether "the settlement . . . is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). To make a final fairness determination, the court must closely examine the proposed settlement, taking into consideration objections and any further developments.

In determining whether a settlement is fair, reasonable, and adequate, a court balances several factors, including:

> the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1291 (9th Cir. 1992) (citing Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615, 625 (9th Cir. 1982)); In re Heritage Bond Litig., 546 F.3d 667, 674 (9th Cir. 2008). This is "by no means an exhaustive list of relevant considerations," though, and "[t]he relative degree of importance to be attached to any particular factor will

depend on the unique circumstances of each case."
<u>Officers for Justice</u>, 688 F.2d at 625.

In evaluating a proposed settlement, "[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." <u>Rodriguez v. West Publ'g Corp.</u>, 563 F.3d 948, 964 (9th Cir. 2009) (quoting <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1026 (9th Cir. 1998)). The Court "does not have the ability to delete, modify, or substitute certain provisions," and "[t]he settlement must stand or fall in its entirety." <u>Hanlon</u>, 150 F.3d at 1026.

## III. DISCUSSION

**A. Fairness, Reasonableness, and Adequacy of the Settlement**

As set forth below and in the Court's prior orders, all but one of the relevant factors favor approval of the proposed settlement, and the remaining factor is neutral.

**1. Strength of Plaintiffs' Case and Risk, Expense, Complexity, and Likely Duration of Further Litigation**

The parties assert that, while they agree settlement is the best outcome at this time, they would both litigate this action vigorously if necessary. (Joint Mot. at 19-24.) Class Counsel asserts that Plaintiffs'

claims are "strong and meritorious," but acknowledges there is no guarantee of recovery in litigation.  (_Id._ at 19.)  Defendants assert they would put on a strong defense of the action at trial.  (_Id._ at 19-20; Rodgers Decl. ¶ 13.)

The parties discuss several risks Plaintiffs would face were they to litigate this action through trial. Defendants' counsel asserts that it would argue, among other things, that the class members should not recover anything because the interest retained by the government is a "reasonable user fee in order to administer the federal asset forfeiture system."  (Rodgers Decl. ¶ 13.) The government would also argue that interest awarded to Plaintiffs should be limited to simple interest, rather than compound interest.  (Joint Mot. at 21.)  The parties also anticipate a possible dispute over whether class members within the Sixth Circuit should be entitled to recovery, as the Sixth Circuit has not directly ruled on the issue of post-CAFRA interest recovery as the Ninth Circuit did in _Carvajal_.  (_Id._ at 20-21.)

Regarding the expense and complexity of possible litigation, the parties highlight the large amount of data present in this case from a large number of government agencies.  (Joint Mot. at 22-23.)  They also note the delay in recovery for class members were the

case to proceed to trial rather than being settled now. (<u>Id.</u> at 23-24.) Given the risks discussed by the parties, and the complexity of class action litigation generally, these factors weigh in favor of final approval of the settlement.

### 2. Risk of Maintaining Class Action Status

Although the parties highlight the difficulties Plaintiffs could face if the class was decertified during trial, the parties do not assert, nor does the Court find, that there is any anticipated difficulty in Plaintiffs maintaining class action status. Therefore, this factor is neutral.

### 3. Amount of Settlement

As explained above, under the terms of the Settlement Agreement, qualifying class members will receive full recovery of the interest earned on their funds while the government held the money, as well as interest on that interest. This amounts to full recovery by Plaintiffs. (Honig Decl. ¶ 17.) As the parties note, Plaintiffs "could not secure a greater recovery for qualifying class members by litigation than they will recoup by the settlement." (Joint Mot. at 26.) In addition, as discussed in the January 2011 Preliminary Approval Order, the settlement procedures seem practical and efficient.

1 (<u>Id.</u> at 12-14.)  For these reasons, this factor weighs
2 heavily in favor of final approval.

3

4 **4.  Extent of Discovery Completed and Stage of**
5 **Proceedings**

6 In analyzing this factor, the Court evaluates whether
7 "the parties have sufficient information to make an
8 informed decision about settlement."  <u>Linney v. Cellular</u>
9 <u>Alaska P'ship</u>, 151 F.3d 1234, 1239 (9th Cir. 1998).  As
10 the Court noted in the January 2011 Preliminary Approval
11 Order, before negotiating the Settlement Agreement, the
12 parties litigated this action for over two years, filing
13 a number of dispositive motions and participating in
14 numerous hearings.  (<u>Id.</u> at 15.)  By the time settlement
15 was reached, Plaintiff had served interrogatories and
16 document requests to which the government responded.
17 (Joint Mot. at 27.)  Additionally, counsel litigated the
18 <u>Sueoka</u> Action, during which both sides conducted
19 extensive discovery.  (<u>Id.</u>)  Thus, based upon the
20 advanced stage of proceedings in this action and
21 counsel's experience from the <u>Sueoka</u> Action, the Court
22 finds the parties possessed sufficient information to
23 make an informed decision regarding settlement.  This
24 factor thus weighs in favor of approval.

25

26

27

28

1      **5.   Experience and Views of Counsel and Presence of**
2            **a Governmental Participant**

3      As stated above, the experience of counsel for both
4  sides in the field of civil forfeiture generally, and in
5  the Sueoka Action specifically, give weight to their
6  strong support for approval of the settlement. (Joint
7  Mot. at 28-29; Rodgers Decl. ¶ 13; Honig Decl. ¶ 17;
8  Gabbert Decl. ¶ 16.)  In addition, as stated in the
9  January 2011 Preliminary Approval Order, Defendants in
10 this action are the government, and the litigation and
11 negotiation that produced the Settlement Agreement were
12 conducted by attorneys from the USAO familiar with asset
13 forfeiture cases and the Sueoka Action.  (Id. at 15.)
14 Thus, these factors weigh in favor of final approval.

15

16     **6.   The Reaction of the Class Members to the**
17           **Proposed Settlement**

18     The reaction of the class members to the proposed
19 settlement has been muted, but positive.  Of the 1,875
20 notices sent out by Lockheed Martin to the last known
21 addresses of potential class members by April 4, 2011,
22 only 38 had filed claim forms by June 13, 2011,
23 representing a response rate of approximately 2%. (See
24 Bukvics Decl. ¶ 12.)  Nobody opted out of the settlement.
25 (Id. ¶ 11.)

26

27

28

Given the lack of objections and the proposed rate of recovery, however, the Court does not find the relatively low response rate of potential class members weighs against approval of the settlement for two reasons. First, there have been no objections to the proposed settlement, nor any requests to opt out.[7]  See Nat'l Rural Telecomm. Coop. v. DirecTV, Inc., 221 F.R.D. 523, 528-29 (C.D. Cal. 2004) ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").  Second, as explained above, the Court finds the proposed recovery under the Settlement Agreement is fair to class members. Therefore, this factor weighs slightly in favor of settlement.

---

[7] On July 11, 2011, the Court received a letter from a federal prisoner in Petersburg, Virginia, asserting an objection to the proposed settlement and attempting to opt out of the settlement.  This objection is untimely, as it was submitted after the opt-out deadline of June 13, 2011; moreover, the prisoner's only objection was to the dismissal with prejudice of the claims of the class members within the jurisdiction of the First and Third Circuits, as he stated he has claims arising out of those circuits.  As discussed in Section I.C, supra, the Sixth Circuit is the only other Circuit in the country to follow the Ninth Circuit in allowing suits against the government for disgorgement of interest on currency seized by the government.  As a result, this settlement can only cover class members with claims within the Sixth and Ninth Circuits and this objection is irrelevant. Moreover, the Court notes that the ostensibly-objecting prisoner indicated his desire to participate in the settlement if possible.

20

**7.   Scope of Claims Released**

Finally, the Court has examined the scope of claims released by class members, and finds the scope of the Settlement Agreement to be fair and reasonable.  (<u>See</u> Settlement Agreement ¶ 60.)  Specifically, the Settlement Agreement does not prevent class members from pursuing claims unrelated to the Settlement Agreement.

Accordingly, all of the relevant factors either weigh in favor of approval of the settlement or are neutral.

**B.   Attorneys' Fees and Incentive Payment for Named Plaintiffs**

Under the Settlement Agreement, the government agrees to pay attorneys' fees and an incentive award payment for Touhey; the Court also must evaluate the fairness and reasonableness of these allocations.  For a settlement to be fair and adequate, "a district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." <u>Staton v. Boeing Co.</u>, 327 F.3d 938, 963 (9th Cir. 2003).

**1.   Attorneys' Fees**

Under the terms of the Settlement Agreement, Class Counsel will receive payment of $110,000.00 for fees and costs incurred in this action, and up to an additional $20,000.00 for work performed after the Settlement

Agreement was signed. (Joint Mot. at 30-31; Settlement Agreement ¶¶ 75-78.)

Plaintiff brings this suit under federal law. Under federal law, attorneys' fees are calculated using a "hybrid lodestar/multiplier" method. McElwaine v. U.S. West, Inc., 176 F.3d 1167, 1173 (9th Cir. 1999). To calculate the amount of attorneys' fees under the lodestar method, a court must "multiply the number of hours reasonably expended by the attorney on the litigation by a reasonable hourly rate." Id. at 1173. Next, the Court must decide whether to adjust the "presumptively reasonable" lodestar figure based upon the factors listed in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 69-70 (9th Cir. 1975), cert. denied, 425 U.S. 951 (1976), that have not been subsumed in the lodestar calculation.[8] Caudle v. Bristow Optical Co., Inc., 224

---

[8] The Kerr factors are:

(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

Kerr, 526 F.2d at 70.

(continued...)

22

F.3d 1014, 1028-29 (9th Cir. 2000). The Ninth Circuit has noted that many of the <u>Kerr</u> factors are subsumed within the lodestar calculation. <u>Jordan v. Multnomah County</u>, 815 F.2d 1258, 1262 (9th Cir. 1987).

In his declaration, Mr. Honig explains why the proposed attorneys' fees are reasonable given the circumstances of this action. Regarding the hours he has spent working on the case, he states that between June 24, 2008, and October 28, 2010, he worked for a total of 229.9 hours.[9] (Honig Decl. ¶ 23; Supp. Honig Decl. ¶ 3.) He asserts he has worked an additional 33.1 hours since settlement was agreed upon, and he anticipates spending another 10 to 15 hours working on the request for final approval and on post-approval communications with class members and the administrator. (<u>Id.</u>)

Mr. Honig asserts that currently, he charges his clients $600.00 per hour for his work. (Honig Decl. ¶

---

[8](...continued)
The Ninth Circuit recognizes the Supreme Court has since called into question the relevance of the factors concerning the fixed or contingent nature of the fee and the desirability of the case. <u>See</u> <u>Resurrection Bay Conservation Alliance v. City of Seward</u>, 640 F.3d 1087, 1095 n.5 (9th Cir. 2011).

[9] At the final fairness hearing, the Court requested Mr. Honig submit copies of his time sheets to the Court; he complied on July 20, 2011, submitting a Supplemental Declaration ("Supp. Honig Decl."), and a copy of his time sheet for this action (Supp. Honig Decl., Ex. A). (Doc. No. 71.) The Court has now reviewed the billing records submitted.

23

30.)  He states that his hourly rate was $550.00 per hour
in 2008, $575.00 per hour in 2009, and $600.00 per hour
in 2010.  (Id.)  Given that he worked 229.9 hours and the
proposed attorneys' fee award is $110,000.00, Class
Counsel would be earning approximately $478.00 per hour
for his work on this case.  (Id. ¶ 31.)  For work
performed after the Settlement Agreement was signed,
Class Counsel requests an hourly rate of $450.00 per hour
for attorneys and $100.00 per hour for paralegals.
(Settlement Agreement ¶ 77.)

Mr. Gabbert assisted Mr. Honig in litigating and
working towards settlement of this action.  (Honig Decl.
¶ 31; Gabbert Decl. ¶¶ 14, 17-18, 20-21.)  Mr. Gabbert
states he worked on this action for a total of 37.3
hours, and that his hourly rate is $600.00 per hour.
(Gabbert Decl. ¶¶ 11, 21.)  The parties argue the
proposed attorneys' fee award should be approved as fair
and reasonable because it does not include any additional
payment for Mr. Gabbert's work, which would total
$22,380.00 if he were reimbursed at his usual rate.  (Id.
¶ 22.)

Mr. Honig also addresses a number of the Kerr
factors.  First, he describes his expertise in the field
of federal civil asset forfeiture law, including his
extensive experience litigating and writing on the

subject. (Honig Decl. ¶¶ 6-8.) Next, Mr. Honig discusses his familiarity with class action lawsuits generally, as well as his appointment as class counsel in the <u>Sueoka</u> Litigation, and his work as lead counsel in two other forfeiture-related class actions. (<u>Id.</u> ¶¶ 9-12.)

Mr. Honig also discusses the time he spent working on this action, covering the investigation and settlement phases and including a number of settlement communications with opposing counsel, both formal and informal. (Honig Decl. ¶ 13.) He states that, based upon his "experience and knowledge of this case," he believes the Settlement Agreement is fair, reasonable, and adequate, and is in the best interests of Plaintiff and the class members, pointing out that class members will receive 100% of the interest earned on their money. (<u>Id.</u> ¶ 17.)

Finally, the parties argue the attorneys' fee award should be approved as it will not diminish the settlement amount received by class members. (Joint Mot. at 31.) The Court also notes the parties followed the preferred procedure of explicitly stating the amount of attorneys' fees in the Settlement Agreement and in the notice provided to potential class members. (<u>See</u> Settlement Agreement ¶¶ 75-78; Bukvics Decl., Ex. A at 7; <u>cf.</u>

<u>Staton</u>, 327 F.3d at 963 n.15 (explaining that where counsel failed to provide the class with explicit notice of the proposed attorneys' fee award, the court must be "all the more vigilant in protecting the interests of class members with regard to the fee award.").)

Based on the above, and after review of Class Counsel's time sheet, the Court finds that the proposed attorneys' fee award is reasonable. Class Counsel's recovery of fees at a rate averaging $478.00 per hour is reasonable for an attorney with Mr. Honig's background and experience in the Central District of California and on civil forfeiture actions. The Court also finds the proposed recovery of fees at a rate of $450.00 per hour for attorneys and $100.00 per hour for paralegals for work performed after the Settlement Agreement was signed to be reasonable. Thus, the Court APPROVES the attorneys' fees proposed in the Settlement Agreement.

**2. Incentive Payment for Named Plaintiff**

The parties also request approval of an incentive payment of $10,000.00 to Touhey. (Joint Mot. at 30-31; Settlement Agreement ¶ 48.)

Incentive payments are "fairly typical" in class action cases, and are intended "to compensate class representatives for work done on behalf of the class, to

make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." Rodriquez, 563 F.3d at 958-59.  Thus, in determining whether an incentive payment is justified in a given case, a court should consider a variety of factors, including:

> 1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation and; 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

Van Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995).  In analyzing these criteria, the Court must conduct an individualized analysis in order to detect "excessive payments to named class members" that may indicate "the agreement was reached through fraud or collusion."  Staton, 327 F.3d at 977; Alberto v. GRMI, Inc., 252 F.R.D. 652, 669 (E.D. Cal. 2008).

Touhey states she has served as the class representative in this action for the past two and a half years.  (Touhey Decl. ¶ 2.)  She asserts that she first spoke with Mr. Gabbert about potentially serving as class representative after two separate incidents of the DEA seizing money of hers and returning it without interest. (Id. ¶¶ 3-11.)  Touhey states that despite her desire to recover the interest, she had to think seriously about

the decision to become the sole named plaintiff in this action, as she was extremely concerned about the possibility of retaliation by the DEA.  (Id. ¶¶ 11-12.)

After agreeing to serve as the class representative, Touhey asserts she "agreed to actively participate in the lawsuit" and agreed to be available to answer interrogatories, produce documents, and give deposition or trial testimony as needed.  (Touhey Decl. ¶ 16.) Touhey's actual participation in the case consisted of speaking to Mr. Gabbert "on several occasions . . . regarding the facts of [her] individual case and how it would affect the class action as a whole," and being available to Mr. Honig at all times.  (Id. ¶ 18.)

Touhey also points out that her proposed incentive payment will not reduce the recovery of class members in any way.  (Touhey Decl. ¶ 23.)  Mr. Gabbert and Mr. Honig both agree the proposed payment is fair and reasonable based upon the risks Touhey took and her participation in the action.  (Gabbert Decl. ¶¶ 24-37; Honig Decl. ¶¶ 34-41.)  They note that another potential class member chose not to act as a named plaintiff in the action because of his fear of government retaliation.  (Honig Decl. ¶ 37; Touhey Decl. ¶ 13.)

At the hearing, Class Counsel further argued in support of the incentive payment of $10,000.00, and addressed the Court's concerns regarding the disparity between the incentive payment proposed here and the incentive payments to the named plaintiffs in the <u>Sueoka</u> Action, who received $5,000.00 and $2,500.00 for litigation which lasted nine years. (<u>See</u> RJN, Ex. B at 13.) Class Counsel pointed out that the four named plaintiffs shared the risk in the <u>Sueoka</u> Action that Touhey bore alone in this action. Class Counsel further noted that the <u>Sueoka</u> named plaintiffs had no direct fear of reprisal by the government, while Touhey had a very real fear of such a reaction.

Based on the above information, the Court finds the proposed incentive payment to Touhey as the only named plaintiff here to be reasonable. Touhey credibly stated her concerns about the risks of attaching her name to an action against the government, and participated in all phases of the litigation. Thus, the Court APPROVES the incentive payment of $10,000.00 to Touhey as the named plaintiff.

## C.   Notice and Administrative Procedures

Under Rule 23(e), the Court must "direct notice in a reasonable manner to all class members who would be bound" by the proposed settlement. Fed. R. Civ. P.

1    23(e)(1).  Plaintiff must provide notice that is "timely,
2    accurate, and informative."  See Hoffmann-La Roche Inc.
3    v. Sperling, 493 U.S. 165, 172 (1989).  Likewise, claims
4    forms must be informative and accurate.  Id. at 172;
5    Churchill Village, LLC v. Gen. Elec., 361 F.3d 566, 575
6    (9th Cir. 2004) (notice is satisfactory if it "generally
7    describes the terms of the settlement in sufficient
8    detail to alter those with adverse viewpoints to
9    investigate and to come forward and be heard.").
10
11        As explained above, the parties notified potential
12   class members by mailing notices to addresses taken from
13   Defendants' files, by publishing a notice in USA Today,
14   by posting a notice on a publicly accessible internet
15   website, and by maintaining a toll-free telephone number
16   with recorded information regarding the proposed
17   settlement.  (Settlement Agreement ¶¶ 9-14; Bukvics
18   Decl.)  The Court finds the notice was reasonably
19   expected to reach potential class members and inform them
20   of the proposed settlement.  In addition, the notice
21   provided to potential class members clearly conveyed the
22   terms of the settlement and the procedures through which
23   to submit claims.  (See Bukvics Decl., Ex. A.)  Thus, the
24   form of notice weighs in favor of approval.
25
26
27
28

## IV. CONCLUSION

Based on the consideration of the foregoing factors, the terms of the Settlement Agreement are fundamentally fair, reasonable, and adequate.  Accordingly, the Court:

(1) GRANTS the Joint Motion for Final Approval; and

(2) DISMISSES the action WITH PREJUDICE.

Dated:  July 25, 2011

_____
VIRGINIA A. PHILLIPS
United States District Judge